**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:19-cv-81636-ROSENBERG/REINHART**

THE HIGHLAND CONSULTING
GROUP, INC.,

      Plaintiff,

v.

JESUS FELIX MINJARES SOULE,

      Defendant.

_____/

## <u>ORDER DENYING SUMMARY JUDGMENT</u>

      This matter comes before the Court on Plaintiff's Motion for Summary Judgment [DE 125] and upon Defendant's Amended Motion for Final Summary Judgment [DE 167]. The Motions have been fully briefed and are ripe for the Court's review. The Court has considered the parties' briefing and the record and is otherwise fully advised in the premises. For the reasons set forth below, the Motions are **DENIED**.

      This case is about an employee who signed a restrictive covenant as part of his employment and resigned several years later. His former employer maintains that he subsequently breached several provisions of the restrictive covenant. He maintains that his former employer breached his employment agreement by failing to pay his salary and bonuses, thereby discharging his obligation to comply with the restrictive covenant. Both parties seek summary judgment, however the Court concludes that genuine issues of material fact preclude granting summary judgment for either party.

# I.     FACTUAL BACKGROUND[1]

Plaintiff Highland Consulting Group, Inc. is a global business consulting firm that James Kerridge founded in the early 1990's.  One industry in which Plaintiff provides consulting services is the mining industry.  Gregory Peacock led Plaintiff's mining division for a period of time until he resigned on September 20, 2019.  On or around September 25, 2019, Peacock founded Surge Performance Group ("SPG"), a consulting firm that also provided services in the mining industry.

Defendant Jesus Felix Minjares Soule began working for Plaintiff in 2011.  He worked under Peacock in Plaintiff's mining division for a period of time.  Defendant's compensation consisted of a salary and reimbursement of out-of-pocket expenses, both of which were to be paid on a bi-weekly basis.  In 2014, he became eligible to participate in Plaintiff's "Discretionary Project Bonus" Program.  Defendant's "employment package" contained a Non-Disclosure, Non-Solicitation, and Compliance Agreement ("the Agreement"), which he signed.  The Agreement included the following provisions:

---

[1] Because the facts relevant to the instant Motions are detailed and, in large part, disputed, the Court sets forth only a basic factual background here.  Additional facts are discussed as necessary as part of the Court's analysis below.

1. **<u>Non-Disclosure of Confidential Information.</u>**  The Employee agrees that the work for which Employee is employed is and will be of a confidential nature, and in connection with the performance of Employee's services on behalf of The Highland Group or any of it's affiliates (hereafter collectively referred to as Highland), Highland may make available to Employee information of a confidential nature as to Highland and its client's methods, trade secrets, programs, operations, clients and employees.  The Employee warrants and agrees that Employee will receive in strict confidence all such confidential information belonging to The Highland Group or to the clients of Highland.  The Employee further agrees to maintain and to assist Highland in maintaining the secrecy of such information to prevent it from coming into unauthorized hands.

The Employee further agrees that:

A) Employee will neither copy nor distribute any material, or other information which comes into Employee's possession as a result of employment by Highland, other than for approved Highland use;

B) Employee will not during the time of employment by Highland nor at any time thereafter, directly or indirectly, disclose to others and/or use for Employee's own benefit or for the benefit of others, confidential information including, but not limited to, trade secrets, customer lists, employee and prospective employee information, proprietary software products, financial statements, or other financial information pertaining to the business of Highland  or to any of its clients, acquired by Employee during the period of employment, except to the extent as may be necessary in the period of employment or except to the extent as may be necessary in the ordinary course of performing duties as an Employee of Highland;

C) Upon termination of employment with Highland, Employee will return to Highland or to Highland's clients all materials and information, and any copies thereof and certify to Highland that Employee no longer has any rights to such materials or information, and agrees that the original and all copies of such materials and information have been returned to Highland or to Highland's client and that Employee will not develop competing professional consulting services based upon the materials and information obtained while employed by Highland; and

D) The Employee acknowledges that confidential information obtained from Highland and/or Highland's clients including but not limited to, the identity of the services being performed for such by Highland, the identity of employees or consultants employed by Highland in the performance of such services, the price being charged by Highland to such clients or potential clients and the needs of such are all trade secrets of Highland and constitute confidential information disclosed to the Employee in connection with Employee's employment.  Therefore, the Employee agrees that the solicitation of or business dealings with such clients or potential clients by the use of such information or trade secrets during employment or subsequent to the Employee's termination of employment with Highland for Employee's own account or on behalf of any person or corporation other than Highland would thus constitute a violation of this agreement.

3

2. **Non-Solicitation.** The Employee agrees that the Employee may not:

A) During the period of employment and for twelve (12) months following the termination for any reason of the Employee's employment, solicit or sell, for Employee's own account or for others, professional consulting services that are competitive with the services of Highland, to any company for which the Employee has solicited or has performed any professional consulting services on behalf of Highland during any part of the twelve months immediately preceding the termination of Employee's employment;

B) During the period of employment and for twelve (12) months following the termination for any reason, work or render professional consulting services, for Employee's own account or for others, for any client of Highland for which Employee has performed any services during any part of the year immediately preceding the termination;

C) During the period of employment and for twelve (12) months following the termination of the Employee's employment, either directly or indirectly, hire any employee or subcontractor of Highland in any capacity whatsoever, for Employee's own account or on behalf of any person or corporation other than Highland, or attempt to induce any employee of Highland to leave the employ of Highland to work for Employee or any other person, firm or corporation.

D) Regardless of circumstances, should such a relationship as discussed in paragraphs A, B, or C above come into existence, either directly or through a third party, the Employee agrees in recognition of extensive marketing expense incurred by Highland to a reimbursement of fifty percent (50%) of any fees derived from Highland clients. In addition, if the Employee accepts employment with a Highland client, a placement fee of thirty-five percent (35%) of total first year income will be due Highland.

Defendant resigned his employment with Plaintiff effective September 25, 2019.

## II.    PROCEDURAL BACKGROUND

In December 2019, Plaintiff filed the Complaint in this matter together with an application for a temporary restraining order and a preliminary injunction. DE 1. Plaintiff brings three counts in the Complaint. Count 1 is for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), and seeks a permanent injunction of Defendant's use of Plaintiff's trade secrets or, alternatively, an award of damages. Count 2 is for breach of the Agreement and seeks a permanent injunction of Defendant's use of Plaintiff's confidential information and for Defendant's return of the confidential information. Count 2 is premised on breaches of Paragraphs 1.A, 1.B, and 1.C of

the Agreement.  Count 3 is for breach of the Agreement and seeks an award of damages.  Count 3 is premised on breaches of Paragraphs 2.A and 2.B of the Agreement.[2]

Defendant brings a counterclaim for breach of contract and seeks an award of damages. DE 135.  The counterclaim is premised on a breach of Defendant's employment agreement by failing to pay him earned bonuses.

The Court denied Plaintiff's request for a temporary restraining order and held an evidentiary hearing on the request for a preliminary injunction on February 19, 2020.  DE 15; DE 56.  Following that hearing, the Court issued an order granting in part and denying in part the request for a preliminary injunction.  DE 60.  The Court determined that Plaintiff had established a substantial likelihood of success on the claims that Defendant breached Paragraphs 1.C and 2.B of the Agreement.  The Court therefore issued a preliminary injunction (1) requiring Defendant to immediately return to Plaintiff or Plaintiff's clients all of their materials and information and any copies thereof, and (2) prohibiting Defendant, for a period of 12 months following the termination of his employment, from rending professional consulting services for any client of Plaintiff for which he performed any services during any part of the year immediately preceding the termination of his employment.  The Court determined that Plaintiff did not establish a substantial likelihood of success on the claims that Defendant violated the DTSA and breached Paragraphs 1.A, 1.B, and 2.A of the Agreement.

The parties thereafter proceeded through discovery, and each party now moves for summary judgment.  Plaintiff seeks final summary judgment and a permanent injunction on Counts 1 and 2, summary judgment as to liability on Count 3, and summary judgment against Defendant

---

[2] Plaintiff has not premised a claim on a breach of Paragraph 2.C of the Agreement.

on his counterclaim.  In addition, Plaintiff asks for a six-month extension of the preliminary injunction.  Defendant seeks summary judgment against Plaintiff on Counts 1, 2, and 3 and seeks summary judgment as to liability on his counterclaim.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact court return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). A court ruling on a summary judgment motion views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).  The court does not weigh conflicting evidence or make credibility determinations. *Id.*  Upon discovery of a genuine dispute of material fact, the court must deny summary judgment and proceed to trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

If the movant shows that there is no genuine dispute as to a material fact, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018).  The non-moving party does not satisfy this burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact." *Jones*, 683 F.3d at 1292 (quotation marks omitted).  "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018).  The non-moving party must "make a showing

6

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Jones*, 683 F.3d at 1292 (quotation marks omitted).

## IV.   ANALYSIS

### I.   Count 1: Violation of the DTSA

Plaintiff premises Count 1 on Defendant's alleged violation of the DTSA.  An owner of a

trade secret used in interstate or foreign commerce that is misappropriated may bring a civil action

under the DTSA for an injunction and damages.  18 U.S.C. § 1836(b)(1), (3).  "Trade secret"

means

> all forms and types of financial, business, scientific, technical, economic, or
> engineering information, including patterns, plans, compilations, program devices,
> formulas, designs, prototypes, methods, techniques, processes, procedures,
> programs, or codes, whether tangible or intangible, and whether or how stored,
> compiled,   or   memorialized   physically,   electronically,   graphically,
> photographically, or in writing if
>
>     (A) the  owner  thereof  has  taken  reasonable  measures  to  keep  such
>     information secret; and
>
>     (B) the  information  derives  independent  economic  value,  actual  or
>     potential, from not being generally known to, and not being readily ascertainable
>     through proper means by, another person who can obtain economic value from the
>     disclosure or use of the information[.]

*Id.* § 1839(3).  The word "misappropriation" is defined to include

> disclosure or use of a trade secret of another without express or implied consent by
> a person who . . . at the time of disclosure or use, knew or had reason to know that
> the knowledge of the trade secret was . . . acquired under circumstances giving rise
> to a duty to maintain the secrecy of the trade secret or limit the use of the trade
> secret[.]

*Id.* § 1839(5).

## A.  A Trade Secret

The parties dispute whether Plaintiff has identified any trade secret that Defendant allegedly misappropriated.  Whether something is a trade secret is a question that is typically for the fact finder to resolve after a full presentation of the evidence.  *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020); *see also Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1878) ("The term 'trade secret' is one of the most elusive and difficult concepts in the law to define.").

To support its position that it has identified trade secrets that are at issue in this litigation, Plaintiff cites two declarations of Brian Saville, Plaintiff's Chief Financial Officer.  *See* DE 124-3; DE 124-32.  In the first declaration, Saville states that, during the course of this litigation, Defendant returned to Plaintiff USB drives containing Plaintiff's data—data that Defendant must have used to continue a project with one of Plaintiff's former clients after he resigned from his employment.  DE 124-3 ¶¶ 24-25, 30.  Saville describes this data as "case studies done by [Plaintiff] for various mining jobs" and subfolders of information about clients and potential clients, including information for a project with Minera Saucito S.A. de C.V. ("Saucito"), a silver mine in Mexico, such as "information on [Plaintiff's] contractors and the rates paid to the specific contractors."  *Id.* ¶¶ 4, 6, 26-29.  In the second declaration, Saville states that the USB drives that Defendant returned also contained documentation of weekly work product for the Saucito project and a presentation about mining that was remarkably similar to one of Plaintiff's mining presentations.[3]  DE 124-32 ¶¶ 18-21.

---

[3] Defendant disputes that Saville's assertions are based on personal knowledge. *See, e.g.*, DE 169 ¶¶ 105-06, 119-20. Saville states in the declarations that his assertions are based on personal knowledge.  DE 124-3 ¶ 1; DE 124-32 ¶ 1. Whether Saville has knowledge to support his assertions is a matter for resolution at trial.

Defendant argues that Saville's declarations do not identify with any particularity information that meets the definition of a trade secret and that Plaintiff therefore has not shown that a triable issue exists as to whether Defendant used or disclosed a trade secret. Defendant is correct that Saville describes much of the data on the USB drives at a high level of generality. However, Saville does at minimum point to one piece of data with greater specificity when he asserts that the information on the USB drives identified Plaintiff's contractors for the Saucito project and the rates paid to the contractors. Courts have stated that information similar as this may qualify as a trade secret. *See, e.g.*, *Hurry Fam. Revocable Tr. v. Frankel*, No. 8:18-cv-2869, 2019 WL 6311115, at *15 (M.D. Fla. Nov. 25, 2019) (citing caselaw standing for the proposition that the identities of suppliers and pricing information may be a trade secret); *Marlite, Inc. v. Eckenrod*, No. 09-22607-civ, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011) (stating that "pricing information such as expenses, costs, profit margins, and run rates have been held to constitute trade secrets"), *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 453 F. App'x 938 (11th Cir. 2012).

Defendant maintains that, even if Plaintiff has identified a purported trade secret, any information specific to a client project was the client's property, not Plaintiff's property, and Plaintiff cannot premise a DTSA claim on information that is not its own. Specific to the Saucito project, Defendant cites to a contract between Saucito and HCG Advisors Mexico[4] to support his proposition that "any materials prepared as part of the service is owned by" Saucito. DE 166 ¶ 83; DE 166-19. Defendant's argument is unpersuasive. First, the section of the Saucito contract that Defendant cites, titled "client information confidentiality," does not support Defendant's

---

[4] Kerridge is an owner of not just Plaintiff, but also The Plaza Group, Inc., which in turn is an owner of several companies that include HCG Advisors Mexico. *See* DE 60 at 2. Plaintiff refers to HCG Advisors Mexico as an "affiliate" of Plaintiff. DE 124 ¶ 30.

proposition; the section speaks of ownership only in terms of specifying that information Saucito does own should be kept confidential.  *See* DE 166-19 at 6-7.  Second, even if the Court were to accept Defendant's proposition that "any materials prepared as part of" the Saucito project were Saucito's property, it is unclear that information such as Plaintiff's contractors and contractor pay rates would necessarily constitute "materials prepared" for the project.[5]  In short, there is a genuine issue for trial as to whether any information that Defendant allegedly misappropriated qualifies as a trade secret.

## B.  Reasonable Measures Taken to Keep the Information Confidential

The parties next dispute whether Plaintiff took reasonable measures to keep its proprietary data confidential.  Whether a party took reasonable steps to protect its confidential information is "a fact-intensive inquiry."  *Balearia Caribbean Ltd. v. Calvo*, No. 16-23300-civ, 2018 WL 6261497, at *4 (S.D. Fla. Aug. 22, 2018).  Plaintiff contends that it has employees and contractors sign confidentiality or nondisclosure agreements and keeps information in password-protected computer databanks, and Plaintiff cites evidence supporting its contention.  *See* DE 57 at 11, 70, 78-79.  Defendant maintains that these practices are insufficient to constitute reasonable measures to keep information confidential as required for a DTSA claim.

 Defendant first argues that not all of Plaintiff's employees are subject to confidentiality or nondisclosure agreements, pointing to Peacock as an example of one such employee.  DE 166 ¶ 15; DE 57 at 194-95.  However, even if Peacock or any other employee did not sign a confidentiality or nondisclosure agreement, the lack of such an agreement does not necessarily mean that he was

---

[5] Defendant also cites other evidence to support a proposition that material prepared for a project with another client, Newmont Suriname, LLC, was that client's property.  DE 166 ¶ 81-82; DE 166-27; DE 57 at 54-55.  However, it is not apparent from the briefing that any material related to this client is at issue in this litigation.

free to share confidential information that he was privy to as a result of his employment.  The law of at least some states provides otherwise.  *See, e.g., Lear Siegler*, 569 F.2d at 288 ("The duty of an employee not to disclose trade secrets and other confidential material is implicit in the employment relationship."); *Avnet, Inc. v. Wyle Lab'ys, Inc.*, 437 S.E.2d 302, 304 (Ga. 1993) ("Even in the absence of an express agreement, it is an implied term of an employment contract that an employee will not divulge a trade secret learned by virtue of his employment to a competitor of his former employer." (quotation marks omitted)); *Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 (Fla. 4th Dist. Ct. App. 1983) (citing caselaw from various states for the proposition that, "Where an employee acquires, during the course of his employment, a special technique or process developed by his employer, the employee is under a duty, even in the absence of an express contractual provision, not to disclose such skills, techniques or processes in his new employment for his own or another's benefit to the detriment of his previous employer.").  Courts have held that an employer's failure to require every employee to sign a confidentiality or nondisclosure agreement does not preclude a finding that the employer took reasonable measures to keep information confidential.  *See, e.g., Balearia Caribbean*, 2018 WL 6261497, at *5; *Marlite*, 2011 WL 39130, at *7.

Defendant next asserts that not all of Plaintiff's contractors are subject to valid confidentiality or nondisclosure agreements, citing Saville's deposition testimony that he had been "informed . . . more or less" that Mexican courts do not enforce nondisclosure agreements. DE 166 ¶ 16; DE 166-4 at 145-46.  But the parties have not briefed for the Court: whether nondisclosure agreements are in fact unenforceable under Mexican law, whether any of Plaintiff's contractors signed unenforceable agreements, whether any such contractors had access to any of the

11

information that is at issue in this litigation, or whether, if so, that necessarily defeats a finding of reasonable measures to keep the information confidential. The Court cannot draw any conclusion based on Saville's testimony that he was informed that Mexican courts do not enforce nondisclosure agreements.

Defendant maintains that Plaintiff "did not implement any procedures, regulations, or rules" concerning employees' and contractors' access to Plaintiff's password-protected computer databanks, such as a rule that only those with signed confidentiality or nondisclosure agreements could access the databanks. DE 166 ¶ 14; DE 57 at 169-70. As already explained, employees who had not signed such agreements may nevertheless have had an obligation to keep Plaintiff's information confidential. And the fact that Plaintiff conceivably could have done more to protect the confidentiality of its information does not preclude a finding that it took reasonable measures to maintain confidentiality. *See Se. Mech. Servs., Inc. v. Brody*, No. 8:08-cv-1151, 2008 WL 4613046, at *12 n.19 (M.D. Fla. Oct. 15, 2008) ("Defendants point out possible measures that [plaintiff] chose not to employ, such as labeling information as 'confidential' or 'trade secret.' The fact that [plaintiff] conceivably could have done more does not make what it did do unreasonable."). Defendant further maintains that he kept Plaintiff's data in a "personal Dropbox account," but it is unclear what is meant when he refers to the account as "personal," as he testified that Plaintiff paid to maintain the account and that it contained Plaintiff's data for his, other employees', and contractors' use. *See* DE 166 ¶ 12; DE 166-10 at 25; DE 57 at 168-69.

Finally, Defendant argues that Plaintiff has filed various documents on the public docket for this case that Plaintiff maintains contain trade secrets. Defendant asserts that Plaintiff's failure to file these documents under seal demonstrates that Plaintiff does not take reasonable measures

to keep its purported trade secrets confidential.  But the Court can envision various reasons why information that Plaintiff previously sought to keep confidential need no longer be kept confidential.  For example, the project to which the information pertained may have terminated, or an individual (such as Defendant, as Plaintiffs have alleged) may already have made the information known through misappropriation.  In sum, the filings on the public docket do not preclude a finding that Plaintiff took reasonable measures to maintain confidentiality.  The Court is unable to conclude as a matter of law that Plaintiff's practices to keep its data confidential either were or were not reasonable.  A genuine issue for trial exists on this element of a DTSA claim.

### C.  Misappropriation

The parties next dispute whether there is evidence that Defendant misappropriated any trade secret.  As already explained, there is evidence that Defendant had some of Plaintiff's information about the Saucito project after he resigned from his employment (as he returned it to Plaintiff on USB drives during the course of this litigation).  It is undisputed that Defendant continued his work with Saucito after he resigned from his employment.  Defendant maintains that he used only information that Saucito provided and general consulting practices to continue his work with Saucito.  *See* DE 166 ¶ 63.  A jury could believe Defendant.  However, based on the evidence, a jury alternatively could find that Defendant took Plaintiff's information, including information concerning Saucito, for the purpose of using it to continue his work with Saucito and/or other clients after he left Plaintiff's employment, and that he did so use the information. *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518-19 (11th Cir. 1988) ("Where the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary judgment is improper.").

Defendant does not argue that, even if he used Plaintiff's trade secrets, he (1) did so with Plaintiff's consent, or (2) did not know or have reason to know that he had a duty to keep the trade secrets confidential. Therefore, the Court need not address those aspects of the definition of "misappropriation" further. *See* 18 U.S.C. § 1839(5) (defining "misappropriation" to include the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret"). There is a genuine issue for trial as to whether Defendant misappropriated Plaintiff's trade secret. Summary judgment is inappropriate for either party on Count 1.

## II.  Count 2: Breach of Contract (Injunction)

Plaintiff premises Count 2 on Defendant's alleged breaches of Paragraphs 1.A, 1.B, and 1.C of the Agreement. The parties are in accord that, under the Agreement's choice-of-law provision, Maryland law governs the Court's construction of the Agreement.

### A.  Paragraphs 1.A and 1.B of the Agreement

The Court addresses Paragraphs 1.A. and 1B. of the Agreement together because both paragraphs involve the same subject matter: the use and distribution of Plaintiff's information. Those paragraphs provide:

A) Employee will neither copy nor distribute any material, or other information which comes into Employee's possession as a result of employment by Highland, other than for approved Highland use;

B) Employee will not during the time of employment by Highland nor at any time thereafter, directly or indirectly, disclose to others and/or use for Employee's own benefit or for the benefit of others, confidential information including, but not limited to, trade secrets, customer lists, employee and prospective employee information, proprietary software products, financial statements, or other financial information pertaining to the business of Highland  or to any of its clients, acquired by Employee during the period of employment, except to the extent as may be necessary in the period of employment or except to the extent as may be necessary in the ordinary course of performing duties as an Employee of Highland;

The parties' arguments as to whether there is a triable issue with respect to breach of these paragraphs are identical to their arguments on the DTSA claim: they dispute whether Defendant used, disclosed, or distributed Plaintiff's trade secrets subsequent to resigning from his employment with Plaintiff.  For the same reasons given above with respect to Count 1, there is a genuine issue for trial as to whether Defendant breached Paragraphs 1.A. and/or 1B. of the Agreement.

**B. Paragraph 1.C of the Agreement**

Paragraph 1.C of the Agreement provides:

C) Upon termination of employment with Highland, Employee will return to Highland or to Highland's clients all materials and information, and any copies thereof and certify to Highland that Employee no longer has any rights to such materials or information, and agrees that the original and all copies of such materials and information have been returned to Highland or to Highland's client and that Employee will not develop competing professional consulting services based upon the materials and information obtained while employed by Highland; and

Plaintiff argues that Defendant did not, upon resigning from his employment, return all of Plaintiff's information, as demonstrated by the fact that he returned information on USB drives

15

only when asked to do so during the course of this litigation.  Plaintiff disputes whether, to this day, Defendant has returned all of its information.

In its preliminary injunction order, the Court concluded that no reasonable person would construe Paragraph 1.C as being satisfied when Defendant returned Plaintiff's information only as part of discovery after this lawsuit, alleging a breach of the paragraph, was filed.  DE 60 at 8; *see Dennis v. Fire & Police Emps'. Ret. Sys.*, 890 A.2d 737, 747 (Md. 2006) (stating that a court interpreting a contract must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated" and that the "test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant" (quotation omitted)). Defendant does not now challenge the Court's conclusion or provide any legal authority to dispute the conclusion.  Defendant instead maintains that Plaintiff always had "access" to the same information that was on the USB drives.  *See* DE 166 ¶¶ 67-68.  But Paragraph 1.C does not merely require a former employee to assure that Plaintiff has *access* to its information; the plain language of the paragraph requires the former employee to *return all* original material and information *and any copies thereof.  See Dennis*, 890 A.2d at 747 ("[W]hen that language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." (quotation omitted)).  Defendant has provided no argument or legal authority demonstrating that his failure to return Plaintiff's information prior to being required to do so as part of this litigation was not a breach of Paragraph 1.C of the Agreement.

**C.  Defendant's Defense: Plaintiff's Breach of the Employment Agreement**

Defendant argues that the Agreement was one part of his employment agreement with Plaintiff.  He contends that, even if there is evidence that he breached Paragraph 1.A, 1.B, and/or 1.C of the Agreement, his obligation to comply with the Agreement was discharged when Plaintiff materially breached his employment agreement first.  Thus, he asserts that he is entitled to summary judgment.

As an initial matter, the Court must address which state's law applies in evaluating this defense.  Defendant asserts that, although Maryland law governs construction of the Agreement, Florida law governs the remainder of his employment agreement because the remainder of the agreement does not contain a choice-of-law provision and because the last act needed to complete the employment agreement (accepting employment) and his performance of the agreement occurred within his state of residence of Florida.  DE 167 at 18-19; *see OJ Com., LLC v. Ashley Furniture Indus., Inc.*, 359 F. Supp. 3d 1163, 1171-72 (S.D. Fla. 2018) (stating that, under Florida choice-of-law principles, "the law applied to questions regarding validity and substantive obligations of a contract is the law of the state in which the contract is made," meaning the state "where the last act necessary to complete the contract is performed," and that "[m]atters regarding performance of a contract . . . are governed by the law of the place where the contract is to be performed"), *aff'd*, 817 F. App'x 686 (11th Cir. 2020); *see also Future Metals, LLC v. Ruggiero*, No. 21-civ-60114, 2021 WL 1701568, at *14 (S.D. Fla. Apr. 13, 2021) (explaining that a "federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits").  Yet, despite his assertion that Florida law governs the employment agreement, Defendant relies on Maryland law to argue that Plaintiff materially breached the

17

employment agreement. *See* DE 167 at 12. Plaintiff argues, without providing supporting authority, that Maryland law applies if Defendant's employment agreement is intertwined with the Agreement. *See* DE 125 at 15. Given the parties' position that the Court should apply Maryland law in evaluating whether Plaintiff breached the employment agreement, the Court proceeds under Maryland law. However, the Court's conclusion on this issue would be the same even if Florida law were to apply.

"[I]f an employer materially breaches an employment agreement that includes a restrictive covenant, its former employee's non-compete obligations under the agreement are discharged."[6] *CytImmune Scis., Inc. v. Paciotti*, No. 16-1010, 2016 WL 3218726, at *3 (D. Md. June 10, 2016) (quotation marks omitted) (citing Maryland caselaw). A party has the right to rescind a contract only upon the other parties' *material* breach; "rescission will not be granted for casual or unimportant breaches, but only for a substantial breach tending to defeat the object of the contract." *Maslow v. Vanguri*, 896 A.2d 408, 423 (Md. Ct. Spec. App. 2006) (quotation marks omitted). "What constitutes a 'material breach' of an employment contract is not subject to a mathematically precise definition but rather varies with the nature of the particular employment." *CytImmune Scis.*, 2016 WL 3218726, at *3 (alteration and quotation marks omitted). "Whether a breach is considered material is a question of fact, unless the question is so clear that a decision can properly

---

[6] Plaintiff does not contest that the Agreement was a part of his employment agreement. It is not clear that an employer's material breach would discharge not only the former employee's obligation not to compete, but also an obligation such as that under Paragraph 1.C of the Agreement to return the employer's material and information. The parties have not argued or briefed that issue to the Court. In the absence of such briefing, the Court proceeds on a premise that a material breach of Defendant's employment agreement theoretically could discharge his obligation to comply with the Agreement entirely. Either party may raise this issue at trial but shall support its argument with legal authority.

be given only one way, and in such a case the court may properly decide the matter as if it were a question of law." *Publish Am., LLP v. Stern*, 84 A.3d 237, 249 (Md. Ct. Spec. App. 2010).[7]

Defendant maintains that Plaintiff breached his employment agreement in two ways: first by failing to pay his salary and expense reimbursements in a timely manner, and second by failing to pay him earned bonuses.  The Court addresses each in turn.

### 1.  Failure to Timely Pay Salary and Expense Reimbursements

It is undisputed that Defendant's salary and reimbursements of his out-of-pocket expenses were to be paid on a bi-weekly basis.  DE 166-5; DE 166-7.  It is undisputed that, at least on occasion, these payments were late.  DE 57 at 45, 136.  It is undisputed that, at least on occasion when payments were going to be late, Saville contacted Defendant, and Defendant was flexible about the situation and accepted the late payment.  DE 166-10 at 15-16; DE 57 at 90, 178.  And it is undisputed that Defendant eventually received the salary and reimbursements he was owed. DE 57 at 29, 89-90, 136.

The parties dispute how often payments were late, and they cite no evidence to indicate how late the payments were.  In addition, there is evidence that Defendant understood the need for Plaintiff to make late payments, said that it was okay, and never complained.  DE 166-10 at 16; DE 57 at 32-33, 130, 178-79.  On this record, the Court cannot conclude as a matter of law that Plaintiff materially breached Defendant's employment agreement by failing to make every salary

---

[7] Florida law provides similarly.  *See, e.g.*, *Bradley v. Health Coal., Inc.*, 687 So. 2d 329, 333 (Fla. 3d Dist. Ct. App. 1997) (explaining that an employer's material breach of an employment agreement discharges an employee's obligations under a noncompete covenant); *Covelli Fam., L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th Dist. Ct. App. 2008) ("The issue of whether an alleged breach is vital or material is reviewed as a question of fact.  To constitute a vital or material breach, a party's nonperformance must go to the essence of the contract." (citations and quotation marks omitted)).

and expense reimbursement payment on time.  There is a genuine issue for trial as to whether the late payments constituted a material breach of the employment agreement.

### 2. Failure to Pay Bonuses

Defendant maintains that Plaintiff failed to pay him earned bonuses and that these bonuses have not been paid to this day.  Although he admits that he initially was a participant in Plaintiff's "Discretionary Project Bonus" Program, Defendant asserts that in 2018 Kerridge approved an arrangement whereby his bonuses were mandatory and were to consist of 2.5% of each project's revenue.  *See* DE 166 ¶ 8; DE 166-7.  As support for the existence of this mandatory bonus arrangement, Defendant cites, among other evidence, his own deposition testimony, Peacock's deposition testimony, and an email from Saville dated September 23, 2019, stating, "Prior bonuses that you are owed are approved.  Rather than wasting both of our time on calculating, I propose putting that amount at $70,000."  DE 166-10 at 19-24; DE 166-13 at 3-6; DE 166-17.

Plaintiff argues that the September 23rd email was part of negotiations to prevent Defendant from resigning from his employment and that, because he did resign two days later, no agreement was reached and no bonuses were owed.  Plaintiff further argues that, other than the September 23rd email, Defendant has no written evidence to support his assertion that he was owed any bonuses.  Plaintiff maintains that Defendant's testimony on this issue is self-serving and entitled to no weight and that testimony and written evidence confirms that payment of bonuses was always a discretionary decision made by Kerridge.

The parties have presented conflicting evidence as to the nature of Defendant's bonuses that creates a genuine issue for trial.  Kerridge and Saville stated in declarations that payment of Defendant's bonuses was always discretionary; Defendant and Peacock testified that Kerridge

approved a mandatory bonus arrangement.[8]  DE 124-3 ¶¶ 13-15; DE 124-9 ¶¶ 3-7, 11-12;

DE 166-10 at 19-24; DE 166-13 at 3-6.  The September 23rd email indicates that some amount in

"[p]rior bonuses" had been "approved" and was "owed."  DE 166-17.  The email does not, at least

explicitly, condition payment of the bonuses on the continuation of Defendant's employment.

Plaintiff contends that its position that bonuses were always discretionary is supported by emails

from Peacock to Kerridge in 2018 and 2019 in which Peacock made "bonus recommendations" to

Kerridge.  *See* DE 124 ¶¶ 82-83; DE 124-23; DE 124-24.  However (1) the copies of those emails

filed on the docket are so heavily redacted that the Court cannot ascertain which emails pertain to

Defendant, and in any event (2) it is for a jury to determine whether these emails can be reconciled

with the testimony that Defendant's bonuses were mandatory or, if the evidence conflicts, which

evidence to discredit.  There is a genuine issue for trial as to whether Defendant's bonuses were

discretionary or mandatory.

Defendant contends further that, even if it is accepted that his bonuses were discretionary,

Kerridge approved at minimum $10,000 in discretionary bonuses that remain unpaid.  Defendant

cites Saville's deposition testimony to support this proposition.  DE 166-4 at 78-80.  For its part,

Plaintiff cites Kerridge's testimony from the preliminary injunction hearing, where he asserted that

[8] Plaintiff asserts that the Court can, at this summary judgment stage, discredit Defendant's testimony, citing as authority *Schultz v. American Airlines, Inc.  See* 449 F. Supp. 3d 1301, 1311 (S.D. Fla. 2020) ("And, while a plaintiff's testimony may not ordinarily be discounted at summary judgment, the Court may disregard self-serving testimony that is 'blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed.'" (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013))), *aff'd*, No. 20-10449, 2021 WL 3483283 (11th Cir. Aug. 9, 2021).  The Court cannot discredit Defendant's testimony about his mandatory bonus arrangement, as the Court does not construe the record as "blatantly" contradicting his position and his position is supported by not only his own testimony, but Peacock's testimony as well.  Plaintiff further asserts that Peacock's testimony contains inadmissible hearsay about what Kerridge told him.  Upon the Court's review of the relevant pages of the deposition transcript, Peacock did not testify as to the actual out-of-court statements that Kerridge made, but rather simply testified that Kerridge approved the mandatory bonus arrangement and the terms of the arrangement.  *See* DE 166-13 at 3-6.  To the extent that Plaintiff believes during trial that Defendant is attempting to admit inadmissible hearsay evidence, Plaintiff may make an appropriate objection.

21

the $10,000 bonus was conditioned on Defendant's continued employment and was not owed when he resigned from his employment. DE 57 at 50-51. It is for the jury to resolve a conflict in the evidence. There is a genuine issue for trial as to whether any nonpayment of bonuses constituted a material breach of Defendant's employment agreement. Due to the genuine issues of trial that the Court has identified, summary judgment is inappropriate for either party on Count 2.

### III. Count 3: Breach of Contract (Damages)

Plaintiff premises Count 3 on Defendant's alleged breaches of Paragraphs 2.A and 2.B of the Agreement.

#### A. Paragraph 2.A of the Agreement

Paragraph 2.A of the Agreement provides:

A) During the period of employment and for twelve (12) months following the termination for any reason of the Employee's employment, solicit or sell, for Employee's own account or for others, professional consulting services that are competitive with the services of Highland, to any company for which the Employee has solicited or has performed any professional consulting services on behalf of Highland during any part of the twelve months immediately preceding the termination of Employee's employment;

The parties dispute whether there is evidence that Defendant, during his employment or the year following the termination of his employment, solicited or sold consulting services on his own behalf to any company that he had solicited or provided consulting services to on Plaintiff's behalf. Plaintiff argues that Defendant provided consulting services to Saucito during the final year of his employment; that he met with the President and Chief Operating Officer of Saucito's owner, Fresnillo, PLC ("Fresnillo"), less than two weeks before resigning; that Fresnillo cancelled the contract for the Saucito project on the same day that Defendant resigned; and that Defendant continued to provide consulting services to Saucito after immediately after resigning. Plaintiff

cites evidence supporting each of these assertions.  *See* DE 57 at 40, 87-88, 145; DE 124-3 ¶ 4. Plaintiff further argues that a company partially owned by Defendant, Minjares Soule Consultores de Negocios S.C. ("MSC"), sent invoices to Saucito between October 2019 and January 2020; and that a company that partially owns Fresnillo, Industrias Penoles S.A.B. de C.V. ("Penoles"), paid MSC millions in Mexican pesos between November 2019 and April 2020.  Plaintiff also cites evidence supporting each of these assertions.  *See* DE 124-1 at 1-3, 5-6; DE 124-3 ¶¶ 8, 19; DE 124-14 at 7.

Defendant contends that this evidence does not demonstrate that he solicited Saucito as a client.  He maintains that Peacock solicited Saucito, that Saucito was SPG's client, and that MSC merely served as SPG's billing agent and transmitted moneys received from Penoles, minus a commission, to SPG.[9]  DE 166 ¶¶ 44-47, 64-65.  A jury could believe Defendant.  However, based on Plaintiff's evidence described above, a jury alternatively could find that Defendant solicited Saucito as a client either for his own behalf or for SPG.  *See Chapman*, 861 F.2d at 1518-19 (stating that circumstantial evidence and the reasonable inferences drawn therefrom may create a genuine issue of material fact).  There is a genuine issue for trial as to whether Defendant breached Paragraph 2.A of the Agreement.

### B.  Paragraph 2.B of the Agreement

Paragraph 2.B of the Agreement provides:

B)  During the period of employment and for twelve (12) months following the termination for any reason, work or render professional consulting services, for Employee's own account or for others, for any client of Highland for which Employee has performed any services during any part of the year immediately preceding the termination;

---

[9] Defendant cites no financial records showing any moneys transmitted from MSC to SPG.

23

Defendant does not dispute that, with respect to at least one of the clients at issue in this litigation (Saucito), he provided consulting services during the final year of his employment and provided consulting services during the year following the termination of his employment. But he maintains that Saucito was not a "client of Highland" for the purpose of applying Paragraph 2.B. *See* DE 169 ¶ 50. However, it is undisputed that, "In February of 2019, Highland entered into a contract in the amount of $115,000.00 for the Discovery & Design at Saucito."[10] DE 124 ¶ 27; DE 169 ¶ 27. The evidence provided to support that proposition is an unsigned proposal addressed to a Fresnillo employee (a proposal that, based on the lack of a dispute on this issue, the Court will assume was accepted) for "a goal-driven, outcomes-focused partnership between The Highland Group and Saucito . . . to complete an operational Diagnostic of mine operations and related areas." DE 124-6. Even if the Discovery & Design contract was signed by Saucito's parent company Fresnillo (not Saucito itself), and even though the Agreement does not define the phrase "any client of Highland," a reasonable person would construe that phrase as including companies such as Saucito under such an arrangement as this. *See Dennis*, 890 A.2d at 747 ("A court construing an agreement . . . must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." (quotation omitted)).

Moreover, as used in the Agreement, the term "Highland" means "The Highland Group or any of its affiliates." DE 124-30 at 1. Subsequent to the Discovery & Design phase of the project, Saucito entered into a contract with HCG Advisors Mexico for additional services. DE 166-19. Kerridge is an owner of not just Plaintiff, but also The Plaza Group, Inc., which in turn is an owner

---

[10] "Discovery & Design" is Plaintiff's trademarked phrase for the "diagnostic phase" of a project. DE 124 ¶ 9.

of several companies that include HCG Advisors Mexico.  *See* DE 60 at 2.  HCG Advisors Mexico, rather than Plaintiff, entered into this second contract with Saucito due to tax and regulatory requirements in Mexico.  DE 166 ¶ 101; DE 57 at 80-81.  Defendant disputes whether HCG Advisors Mexico is an "affiliate" of Plaintiff, and the Agreement does not define that term, however a reasonable person would construe the term as including HCG Advisors Mexico and would construe Saucito as a "client of Highland" under such an arrangement at this.  *See Dennis*, 890 A.2d at 747.

Defendant makes no further argument to show that his provision of consulting services to Saucito during the year following the termination of his employment with Plaintiff was not a breach of Paragraph 2.B of the Agreement.  He instead asserts that, even if he breached the Agreement, Plaintiff cannot show that he caused Plaintiff any damages and cannot prove damages to any reasonable certainty.  Defendant contends that Saucito has not attributed the cancellation of its contract with Plaintiff to any of his actions and that the cancellation could have been due to the fact that key employees for the Saucito project, including Defendant and Peacock, were leaving Plaintiff's employment due to its treatment of its employees.  "In a breach of contract action, upon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty."  *Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 934-35 (Md. Ct. Spec. App. 2007) (defining "proximate cause" as "losses that actually resulted from the breach" and "reasonable certainty" as "the likelihood of the damages being incurred as a consequence of the breach, and their probable amount").

As described above, Plaintiff has presented evidence from which a jury could find that Defendant solicited Saucito as a client for his own behalf.  At trial, Defendant may present contrary evidence to show that Saucito's cancellation of the contract for the Saucito project was due to factors other than his actions.  Also as described above, Plaintiff has presented evidence from which a jury could find that Defendant, through his company MSC, received millions of Mexican pesos for his work with Saucito.  Defendant may present evidence at trial to show that he did not derive any fees from Plaintiff's clients as a result of his purported beach of the Agreement and that damages should not be awarded under Paragraph 2.D of the Agreement.  There are genuine issues for trial on the element of causation and on the measure of damages.

### C.  Defendant's Defenses

Defendant next contends that, even if there is evidence that he breached Paragraphs 2.A and 2.B of the Agreement, he has defenses that excuse his breach, such that he is entitled to summary judgment.[11]

### 1.  Plaintiff's Breach of the Employment Agreement

As the Court has already discussed, Defendant argues that his obligation to comply with the Agreement was discharged when Plaintiff materially breached his employment agreement by failing to pay his salary and expense reimbursements in a timely manner and by failing to pay him earned bonuses.  For the reasons given above, there are genuine issues for trial on this defense.

---

[11] In prior motion briefing, Defendant asserted as an additional defense that Paragraphs 2.A and 2.B of the Agreement are overbroad and therefore unenforceable under Maryland law.  Defendant does not pursue this argument in the instant summary judgment briefing, and therefore the Court does not address it.

## 2.   Enforceability of Paragraph 2.D of the Agreement

Paragraph 2.D of the Agreement provides:

D) Regardless of circumstances, should such a relationship as discussed in paragraphs A, B, or C above come into existence, either directly or through a third party, the Employee agrees in recognition of extensive marketing expense incurred by Highland to a reimbursement of fifty percent (50%) of any fees derived from Highland clients. In addition, if the Employee accepts employment with a Highland client, a placement fee of thirty-five percent (35%) of total first year income will be due Highland.

Defendant asserts that Paragraph 2.D is unenforceable for two reasons.  First, he maintains that the requirement of a 50% fee reimbursement in liquidated damages is an unenforceable penalty because it is untied to any reasonable measure of damages that Plaintiff would sustain as a result of a breach of the Agreement.  Contracting parties may agree to a specific sum for liquidated damages, in lieu of compensatory damages, where the damages resulting from a breach of the contract would be indeterminable or otherwise difficult to prove.[12]  *Williard Packaging Co. v. Javier*, 899 A.2d 940, 947-49 (Md. Ct. Spec. App. 2006).  Liquidated damages must be in an amount reasonably anticipated to compensate for the damages of a breach and may not be a penalty.  *Bd. of Educ. of Talbot Cnty. v. Heister*, 896 A.2d 342, 352 (Md. 2006).

Defendant contends that Plaintiff typically attempts to achieve a 15% net profit on client projects, citing Saville's deposition testimony as support.  DE 166 ¶ 91; DE 166-4 at 160. Defendant maintains that the 50% fee reimbursement provided for under Paragraph 2.D therefore results in a windfall to Plaintiff and is an unenforceable penalty, rather than a reasonable anticipation of damages.  Plaintiff in turn cites Kerridge's declaration in which he asserts that the 50% fee reimbursement is appropriate because it approximates Plaintiff's contribution margin after

---

[12] Plaintiff does not contest Defendant's description of the 50% fee reimbursement as providing for liquidated damages.

certain costs and commissions are deducted from gross revenue.  DE 124-9 ¶ 13.  Genuine issues of fact exist as to whether and which costs are deducted from the 50% fee reimbursement and how much of the reimbursement results in profit to Plaintiff.  On this record, the Court cannot determine as a matter of law that the damages provided for under Paragraph 2.D are an unenforceable penalty rather than an amount that would reasonably compensate Plaintiff for a breach of the Agreement.

Second, Defendant maintains that Paragraph 2.D is unenforceable because damages "are determined as a percentage of fees derived from Highland clients by anyone—not just [him]." DE 167 at 18.  The paragraph provides that "the Employee agrees . . . to a reimbursement of fifty percent (50%) of any fees derived from Highland clients."  Defendant provides no legal authority for his interpretation of this language as requiring him to reimburse fees that anyone else derived from Plaintiff's clients.  Defendant does not argue that a reasonable person would construe the language in such a manner.  *See Dennis*, 890 A.2d at 747 ("A court construing an agreement . . . must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." (quotation omitted)).  In the absence of proper briefing on this issue with supporting authority, the Court cannot conclude that Defendant's own interpretation of Paragraph 2.D renders it unenforceable.  As explained above, Plaintiff has presented evidence from which a jury could find that Defendant derived fees from Plaintiff's clients, such as moneys paid through his company MSC for work with Saucito.  Due to the genuine issues for trial that the Court has identified, summary judgment is inappropriate for either party on Count 3.

**IV: Counterclaim: Breach of Contract**

Defendant premises his counterclaim on Plaintiff's alleged breach of his employment agreement by failing to pay him earned bonuses.  As already discussed, there are genuine issues for trial as to whether Defendant had a mandatory or discretionary bonus arrangement and whether, even if the arrangement was discretionary, he is nevertheless owed bonuses.

Plaintiff maintains that, to the extent it is Defendant's position that the parties agreed that bonuses would be mandatory, he cannot prevail on his counterclaim because that agreement was not put into writing, he claims bonuses extending over the course of more than one year, and the statute of frauds therefore bars the counterclaim.  The parties dispute whether Maryland law or Florida law should apply in evaluating the counterclaim.  The Court's conclusion as to Plaintiff's statute-of-frauds argument is the same regardless of which state's law applies.  Under the law of both states, the statute of frauds requires a writing only if the contract at issue cannot be performed within one year.  A contract of an indefinite term does not fall within the statute of frauds unless it is impossible to perform the contract within one year.  *See, e.g.*, *Griffith v. One Inv. Plaza Assocs.*, 488 A.2d 182, 184 (Md. Ct. Spec. App. 1985) ("[T]here are two sets of circumstances under which the one-year provision of the Statute of Frauds will bar a claim.  One occurs when the parties expressly and specifically agreed that their oral contracts were not to be performed within one year.  The other occurs when it is impossible by the terms of the contract for it to be performed fully within one year." (citation and quotation marks omitted)); *Chesapeake Fin. Corp. v. Laird*, 425 A.2d 1348, 1351 (Md. 1981) ("The statute [of frauds] will not apply where the contract can, by any possibility, be fulfilled or completed in the space of a year, although the parties may have intended its operation should extend through a much longer period." (quotation marks

omitted)); *Browning v. Poirier*, 165 So. 3d 663, 666 (Fla. 2015) ("[J]udging from the time the oral contract of indefinite duration is made, if the contract's full performance is possible within one year from the inception of the contract, then it falls outside the statute of frauds."); *Cabanas v. Womack & Bass, P.A.*, 706 So. 2d 68, 69 (Fla. 3d Dist. Ct. App. 1998) ("Contracts for employment which are terminable at will by either party for an indefinite period of duration do not fall under the statute of frauds.").

Plaintiff cites no evidence to indicate that any agreement for mandatory bonuses was for an express duration of more than one year. Plaintiff cites no evidence to indicate that it would have been impossible to perform an agreement for mandatory bonuses within one year. For example, Plaintiff has provided no evidence showing that Defendant's employment was for a definite term in excess of one year, rather than at will, such that he necessarily would be owed bonuses over the course of more than one year. In the absence of such evidence, the Court cannot conclude that the statute of frauds bars Defendant's counterclaim.

Plaintiff further maintains that, to the extent it is Defendant's position that the parties agreed that bonuses would be mandatory, there was no consideration for such an agreement. Defendant's and Peacock's deposition testimony reflects that Plaintiff committed to pay mandatory bonuses beginning in 2018 in exchange for Defendant committing to continue his employment when other key employees were leaving Plaintiff's employment. DE 166-10 at 21-22; DE 166-13 at 5. Plaintiff provides no explanation or authority to show why, if this testimony is accepted as true, the bonuses in exchange for Defendant's continuation of his employment does not suffice as consideration for a mandatory bonus arrangement. The Court cannot conclude that a lack of consideration bars Defendant's counterclaim. Due to the genuine

issues for trial discussed above relating to Defendant's bonus arrangement, summary judgment is inappropriate for either party on the counterclaim.

## V.     Extension of the Preliminary Injunction

The Court's preliminary injunction prohibited Defendant, for a period of 12 months following the termination of his employment, from rendering professional consulting services for any client of Plaintiff for which he performed any services during any part of the year immediately preceding the termination of employment. DE 60 at 16.  This 12-month period enforced the period provided for in Paragraph 2.B of the Agreement:

> B) During the period of employment and for twelve (12) months following the termination for any reason, work or render professional consulting services, for Employee's own account or for others, for any client of Highland for which Employee has performed any services during any part of the year immediately preceding the termination;

Plaintiff now seeks a six-month extension of this period, stating that it "received only six months (during a pandemic), rather than a full year as provided in the Agreement."  DE 125 at 19-20.  Presumably by this Plaintiff means that it does not believe it received the benefit of a year of the preliminary injunction due to business interruptions caused by the COVID-19 pandemic. Plaintiff provides no legal authority to support its request.  Plaintiff provides no legal authority to support the proposition that interruptions caused by the pandemic, or interruptions for any other reason, justify an extension of the 12-month term in the Agreement.  In the absence of supporting legal authority, Plaintiff's request to extend the preliminary injunction for six months is denied.

31

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [DE 125] is **DENIED**

and Defendant's Amended Motion for Final Summary Judgment [DE 167] is **DENIED**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 26th day of August,

2021.

ROBIN L. ROSENBERG

UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record

32